Receipt #041981

ORIGINAL

FILED
DEC 27 2004
U.S. COURT OF FEDERAL CLAIMS

ECF

IN THE

UNITED STATES COURT OF FEDERAL CLAIMS

ANADARKO E&P COMPANY LP, and DEVON ENERGY PRODUCTION COMPANY, L.P.,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 04-1822C
(Judge ______)

# COMPLAINT OF ANADARKO E&P COMPANY LP AND DEVON ENERGY PRODUCTION COMPANY, L.P.

## I. INTRODUCTION

1. The United States has exclusive jurisdiction, control and the power of disposition over the submerged lands on the outer continental shelf that extend beyond state-owned submerged lands (the "OCS"). The Outer Continental Shelf Lands Act ("OCSLA") grants the United States the discretion to lease these OCS lands for oil and gas exploration and development. As the Supreme Court recently held in a case involving OCS oil and gas leases offshore North Carolina, once the United States sells such leases "its rights and duties therein are

governed generally by the laws applicable to contracts between private parties." *Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604 (2000). The Court held that the United States commits a material breach of OCS leases if it fails to carry out its contractual obligations in a "timely and fair" manner or if, in processing a lessee's request for a necessary governmental approval, it "deviates significantly" from the "procedures and standards" in effect when the lease was issued, in a manner that results in a "substantial" delay in or interference with the lessee's exploration and development of the leases. *Id.* at 620-21.

2. In *Mobil Oil*, the Court held that a post-leasing federal statute, the Outer Banks Protection Act ("OBPA"), constituted a "repudiation" of the North Carolina OCS leases, entitling the lessees to rescind the contracts and obtain restitution of the bonuses they had paid, because the statute imposed new conditions that would substantially delay exploration and development of those leases. *Id.* at 621 ("Government's communication of its intent to commit that breach [in the OBPA] amounted to a repudiation of the contracts.") In so holding, the Court examined the terms of the North Carolina leases, which provided that the lease—

> is issued subject to the Outer Continental Shelf Lands Act [OCSLA]; Sections 302 and 303 of the Department of Energy Organization Act, 91 Stat. 578, 42 U.S.C. 7152 and 7153; all regulations issued pursuant to such statutes and in existence upon the effective date of this lease; all regulations issued pursuant to such statutes in the future which provide for the prevention of waste and the conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein; and all other applicable statutes and regulations.

Construing this provision, the Supreme Court held:

> The lease contracts say that they are subject to then-existing regulations and to certain future regulations, those issued pursuant to OCSLA and §§302 and 303 of the Department of Energy Organization Act. This explicit reference to future regulations makes it clear that the catchall provision that references 'all other applicable ... regulations' ... must include only statutes and regulations already

> existing at the time of the contract, ... a conclusion not questioned here by the Government. Hence, these provisions mean that the contracts are not subject to future regulations promulgated under other statutes, such as new statutes like [the Outer Banks Protection Act]. *Id.* at 616.

3. This Complaint relates to 11 undeveloped OCS leases located offshore California (the "Leases") currently owned by the plaintiffs and other companies (collectively, the "Lessees") and purchased from the United States by them or their predecessors in interest. This lawsuit arises because, as in *Mobil Oil*, the Government has failed to process the Lessees' requests for certain necessary approvals in a "timely and fair" manner, and has instead "deviated significantly" from the "procedures and standards" in effect when the Leases were acquired, in a manner that has resulted in a substantial delay of operations.

4. Specifically, the Government breached the Leases in the following manner. First, amendments to the Coastal Zone Management Act, 16 U.S.C. §§ 1451 *et seq.* ("CZMA"), enacted years after the Leases were issued, were held for the first time in *California v. Norton*, 150 F. Supp.2d 1046 (N.D. Cal. 2001), to require the cessation of all operations under the Leases unless and until the Government determines that lease "suspensions," which extended the life of the Leases and were issued in November 1999, were consistent with the State of California's coastal management program. Second, even though the Government did not seek a stay of the court's decision in *California v. Norton*, the Government has still not yet conducted the consistency determination required by the court. The application of the amended CZMA to the Leases, and the Government's inaction have resulted in substantial delays in, and potentially a complete bar to, further exploration and development of the Leases. The plaintiffs accordingly seek the award of restitutionary, reliance or expectation damages, whichever is greater, as a result of the Government's material breach of the Leases.

## II. PARTIES

5. Plaintiff Devon Energy Production Company, L.P. ("Devon") is an Oklahoma Limited Partnership. Devon's principal place of business in Oklahoma City, Oklahoma. Devon's activities include exploring for and producing crude oil and natural gas. Devon has an ownership interest in two of the Leases.

6. Plaintiff Anadarko E&P Company LP ("Anadarko") is a corporation organized under the laws of Delaware. Anadarko's principal place of business is in The Woodlands, Texas. Anadarko's activities include exploring for and producing crude oil and natural gas. Anadarko has an ownership interest in nine of the Leases.

## III. JURISDICTION

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1491.

## IV. FACTUAL BACKGROUND

### A. The OCS Leasing Process

8. The OCSLA, 43 U.S.C. §§ 1301 *et seq.*, confers on the United States jurisdiction, control and the power of disposition over the mineral resources found in the subsoil and seabed of the OCS.

9. Under the OCSLA, 43 U.S.C. § 1337(b), the Secretary of the Interior ("Secretary") is empowered to sell leases that "entitle the lessee to explore, develop and produce the oil and gas within the leased area, conditioned upon due diligence and approval of the development and production plan required by" § 1351. Lease terms therefore grant a lessee the "exclusive right and privilege to drill for, develop, and produce oil and gas resources," in exchange for an up-front bonus and annual rentals. The Secretary has delegated most of his or

her authority under the OCSLA to the Minerals Management Service of the Department of the Interior ("MMS"). 43 U.S.C. § 1337(a).

10. MMS has divided the OCS into a number of planning areas for purposes of oil and gas leasing, including the Pacific Region. The Pacific Region consists of the Washington-Oregon, Northern California, Central California and Southern California Planning Areas.

11. All OCS planning areas are subdivided into blocks (usually three miles square) containing approximately 5,760 acres. An OCS oil and gas lease usually, but not always, covers a single block.

12. After the Secretary has adopted an OCS oil and gas leasing schedule required by 43 U.S.C. § 1344, he or she may commence the analysis and consultation required to conduct a sale of OCS leases within one of the planning areas included on the five-year schedule. Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, MMS prepares an Environmental Impact Statement ("EIS") which considers the environmental impacts of the sale, as well as subsequent exploration and production activities in the area proposed for leasing, and alternatives to the proposed sale. Publication of a final EIS is normally preceded by public hearings and is subject to public comment regarding the proposed OCS activities.

13. After reviewing the final EIS, the Secretary determines whether to publish a proposed notice of sale, which identifies the blocks made available for leasing in a particular planning area, proposed bidding systems, lease terms, and other pertinent information. Governors of affected states, as well as executives of affected local governments, then have the opportunity to make recommendations regarding the proposed OCS lease sale. Under 43 U.S.C. § 1345(c), the Secretary is required to accept a Governor's recommendations if the Secretary determines, after providing an opportunity for consultation, that they provide for a reasonable

balance between the national interest and the well-being of the citizens of the affected state. The Secretary is required to communicate to the Governor, in writing, the reasons for his or her determination to accept or reject the Governor's recommendations or to implement any alternatives identified in consultation with the Governor that will provide for a reasonable balance between the national interest and the well-being of the citizens of the affected state.

14. If the Secretary decides to proceed with an OCS lease sale, a final notice of sale is published, specifying the date, time and place of sale, the blocks available for lease, lease terms, bidding requirements, and other pertinent information. No fewer than 30 days after publication of the final notice, MMS conducts the sale and opens sealed competitive bids.

15. The Secretary is authorized to grant OCS leases only to the highest responsible qualified bidders, 43 U.S.C. § 1337(a), although he or she reserves the right to reject any and all bids. Upon acceptance of a high bid and payment of the full cash bonus and first year's rental, the United States issues a lease to the successful bidder or bidders. All money received pursuant to OCS lease sales is deposited in the Treasury of the United States. 43 U.S.C. § 1338.

16. According to their terms and applicable federal regulations, OCS leases run for a fixed period of either five or ten years ("primary term") and "as long [thereafter] as oil or gas is produced from the lease in paying quantities, or drilling or well reworking operations as approved by the Secretary [of Interior] are conducted." 30 C.F.R. § 256.37. A lease that is not producing oil or gas in paying quantities within its primary term, or on which approved drilling or well reworking operations are not being conducted within the primary term, expires and reverts back to the Government unless MMS extends the lease beyond its initial period by virtue of a "suspension." MMS can extend a lease either by granting a lessee's request for a suspension

or directing a suspension on its own initiative. *Id.* § 256.73(a) & (b). In either case, the lease does not expire as long as the suspension remains in effect. *Id.*

17. A lessee is not typically prohibited from conducting exploratory or pre-production activities during the period of a lease suspension. To the contrary, one of the principal reasons that lessees seek suspensions is to keep the leases from expiring while they conduct such activities, for example, drilling a well or conducting shallow hazard or bottom surveys. Accordingly, MMS is authorized to grant a lease suspension if it determines that the suspension would allow for the proper development of the lease. *Id.* § 250.174(a).

**B. The Exploration and Production Process and State Participation.**

18. After purchasing a lease, an OCS lessee may submit an exploration plan ("EP") to MMS for its approval. Under the OCSLA, 43 U.S.C. § 1340(c)(1), the Secretary "shall" approve an EP within 30 days of its submission unless he or she determines: (1) that activities proposed under the EP would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral, to the national security or defense, or to the marine, coastal, or human environment; and (2) that the proposed exploration activities cannot be modified to avoid such probable serious harm or damage. If an EP is disapproved under 43 U.S.C. § 1340(c)(1) and a lessee is thereby deprived of its right to explore for oil and gas, the United States is required to pay the lessee the lesser of the fair value of the lease or the lessee's costs in acquiring and exploiting its lease, with interest from the date such costs are incurred. 43 U.S.C. §§ 1334(a)(2)(C); 1340(c)(1).

19. If warranted by exploration, an OCS lessee prepares and submits to the Secretary a development and production plan ("DPP"). 43 U.S.C. § 1351. The plan must describe the facilities the lessee will construct and employ and the operations the lessee will

undertake in connection with its proposed activities. 43 U.S.C. § 1351(a) & (c). Furthermore, the plan must set forth the environmental safeguards the lessee will put in place in developing and producing oil or gas from the lease(s). 43 U.S.C. § 1351(a) & (c)(3). The Secretary may disapprove a DPP if, *inter alia*, the Secretary determines that implementation of the plan would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), to the national security or defense, or to the marine, coastal or human environments, the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time, and the advantages of disapproving the plan outweigh the advantages of development and production. 43 U.S.C. § 1351(h)(1)(D). If a plan is disapproved for this reason, then upon expiration of five years or at an earlier time upon request of a lessee, the Secretary shall cancel the lease and the lessee shall be entitled to receive the fair value of the lease or the lessee's costs in acquiring and exploiting its lease, with interest from the date such costs are incurred. 43 U.S.C. §§ 1334(a)(2)(C); 1351(h)(2)(C).

20. First enacted in 1972, and amended in 1976 to deal explicitly with OCS-related activities, the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451 *et seq.*, provides for state participation in certain activities affecting its coastal zone. Under Section 307(c)(3) of the Act, 16 U.S.C. § 1456(c)(3), a state is allowed to review activities proposed by a lessee in an EP or DPP, to the extent such activities affect land or water uses in the coastal zone of that state, to determine whether they are consistent with the state's federally-approved coastal management program ("CMP"). If a state enters a consistency objection within the period specified by 16 U.S.C. § 1456(c)(3), no further exploration or development activities are permitted unless the Secretary of Commerce reviews that objection and overrides it by

concluding either that the proposed activities are consistent with the objectives of the CZMA, or are otherwise necessary in the interests of national security. *Id.*

21. Under Section 307(c)(1) of the Act, 16 U.S.C. § 1456(c)(1), the federal Government must also conduct certain of its own activities in a manner consistent to the maximum extent practicable with the state's CMP. For those activities, a federal agency must provide a state with either a "consistency determination" that the proposed activity will take place "in a manner consistent to the maximum extent practicable with the enforceable policies of the state's approved management program," or a so-called "negative determination" that the activity will have no coastal effects (collectively, a "CZMA (c)(1) determination"). 15 C.F.R. §§ 930.34, 930.35(d), 930.39(a). "Final federal action" on federal activities that are subject to the CZMA Section 307 (c)(1) process cannot take place sooner than 90 days after the federal agency has notified the state of its consistency or negative determination, unless the state concurs in the determination, is deemed to have concurred under 15 C.F.R. § 930.41, or an alternative period is mutually agreed by the agency and the state. *Id.* § 930.41(c).

22. At the time that the Leases were issued, Section 307(c)(1)(A) of the CZMA provided that only federal activities that "directly affected" the state's coastal zone were subject to the Section 307(c)(1) process:

> Each Federal agency conducting or supporting activities *directly affecting* the coastal zone shall conduct or support those activities in a manner which is consistent, to the maximum extent practicable, with approved State management programs. (emphasis added).

23. In 1990, Congress amended Section 307(c)(1)(A) to read (additions are italicized; deletions are bracketed):

> Each Federal agency [conducting or supporting activities directly affecting] *activity within or outside the coastal zone that affects*

> *any land or water use or natural resource of* the coastal zone shall [conduct or support those activities] *be carried out* in a manner which is consistent, to the maximum extent practicable, with *the enforceable policies* of approved State management programs. *A Federal agency activity shall be subject to this paragraph unless it is subject to paragraph (2) or (3).*

24. The 1990 CZMA Amendments were intended to reverse the Supreme Court's decision in *Secretary of Interior v. California*, 464 U.S. 312 (1984), that the act of issuing OCS leases was not subject to CZMA's requirements because they did not "directly affect" the state's coastal zone. The 1990 CZMA amendments were intended to "make clear" that the sale of oil and gas leases is subject to the CZMA. H.R. Rep. 101-964 at 2676 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1, 6.

**C. The California OCS Leases.**

25. This lawsuit involves 11 undeveloped OCS oil and gas leases: OCS-P 396, OCS-P 397, OCS-P 402, OCS-P 403, OCS-P 408, OCS-P 414, OCS-P 427, OCS-P 432, OCS-P 460, OCS-P 462, and OCS-P 464 (collectively, the "Leases"). Plaintiffs or their predecessors acquired interests in the Leases in two lease sales, Nos. 53 and 68.. Both of these lease sales took place pursuant to five-year oil and gas leasing schedules adopted by the Secretary as required by the OCSLA and its implementing regulations.

26. **Lease Sale 53.** After complying with the pre-lease sale requirements set forth above in paragraphs 20 through 22, Lease Sale No. 53 was conducted in May 1981, and leases were issued to successful bidders effective July 1981. Among the leases awarded as a result of the sale were OCS-P Nos. 396, 397, 402, 403, 408, 414, 427, and 432.

27. **Lease Sale 68.** After complying with the pre-lease sale requirements set forth above in paragraphs 20 through 22, Lease Sale No. 68 was conducted in June 1982, and leases

were issued to successful bidders effective August 1, 1982. Among the leases awarded as a result of the sale were OCS-P 460, 462, and 464.

28. The Leases are located in the Offshore Santa Maria Basin off the coast of Santa Barbara and San Luis Obispo counties, and in the Santa Barbara Channel off Santa Barbara county. Each of the Leases has a primary term of five years and then as long thereafter as oil or gas is produced in paying quantities.

29. Lessees or their predecessors made cash bonus payments for these Leases totaling over $31 million. A chart depicting the amount paid in bonuses for each lease, its current owner(s), and each Lessee's individual share of the bonus payments, is Attachment A to the Complaint. In addition to these bonus payments, the Lessees' annual rentals to the United States have totaled approximately $ 234,300.

30. All of the Leases were issued on standard form 3300-1 (September 1978) and contain additional stipulations. Each such lease is substantially the same as Attachment B. These Leases were entered into "by and between the United States of America (hereinafter called the 'Lessor')" and the lessee. Section 2 of the Leases provides (as did the leases at issue in *Mobil Oil*), that:

> The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf described [herein].

Section 1 of the Leases provides (as did the leases at issue in *Mobil Oil*) that they are --

> issued subject to the [OCSLA]; all regulations issued pursuant to the statute and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and the conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein; and all other applicable statutes and regulations.

31. MMS regulations permit lessees to join their separate leases into units for the purpose of joint development, under formal "unit agreements" that must be approved by MMS. 30 C.F.R. § 250.1301. Six of the Leases (OCS-P 396, 397, 402, 403, 408, and 414) were organized into the "Lion Rock" unit. Leases OCS-P 427 and 432, along with other leases, were organized into the "Purisima Point" unit. Leases OCS-P 460, 462, and 464 were organized into the "Gato Canyon" unit. One company was designated the "operator" of each unit. Collectively, Lessees expended tens of millions of dollars conducting seismic, exploratory and other operations on the Leases, including the drilling of eight exploratory wells, which has located substantial reserves of oil.

**D. The United States' Post-Lease Amendment of the CZMA and Refusal to Make a Section 307(c)(1) Determination for the Lessee's November 1999 Suspension Requests.**

32. Each of the Leases is beyond its five-year primary term, and thus can continue to exist only by reason of suspensions. MMS has extended the terms of the Leases by granting suspensions on a number of occasions — first at the request of the Lessees and then, beginning in October 1992, at the direction of MMS. MMS directed the October 1992 suspension in order to conduct its California Offshore Oil and Gas Energy Resources ("COOGER") study concerning the status and future of oil and gas development offshore California. MMS proposed the study as a means to "assist MMS in considering future exploration and development plans under its regulations and satisfy information needs that [Ventura, Santa Barbara and San Luis Obispo] Counties have expressed over the past several years." MMS termed the COOGER study "a key step leading to the future development of discovered oil and gas resources offshore California." MMS requested that the Lessees participate in, and provide the majority of the funding for, the study. The Lessees acceded to that request.

33. MMS had informed the Lessees that the COOGER study would take only three years. However, it took MMS over two years simply to retain a contractor to conduct the study. The final COOGER report ultimately was not issued until seven years after MMS had first contacted the Lessees about the project. Although the COOGER process was intended to "alleviate certain issues and concerns held by" the counties, the counties concluded that the report did not "satisfy county objectives."

34. In December 1998, after extending its directed suspension on several occasions as a result of the delay in the COOGER study, MMS informed the Lessees that the directed suspension would terminate on August 16, 1999, and instructed them to submit additional suspension requests by May 15, 1999. MMS directed that these suspension requests set forth a schedule of activities leading to additional exploration or the commencement of production, with measurable milestones demonstrating physical activity on the Leases.

35. By May 15, 1999, the unit operators submitted suspension requests for the each of the Leases in their units. Each of the suspension requests detailed the additional activities that the Lessees intended to undertake to lead to further exploration or production on the various units. To provide more time to consider the Lessees' requests, MMS on August 13, 1999, directed suspensions for all but one of the Leases through November 15, 1999, and requested the Lessees to submit certain additional information in support of their suspension requests. In its August 13, 1999 letters, MMS purported to deny the suspension requests with respect to Lease OCS-P 462, a decision that has been challenged by administrative appeal to the Interior Board of Land Appeals. If the owners of this lease succeed in their administrative appeals, the terminated lease will be reinstated and would have been subject to the November 1999 suspensions described below.

36. On November 12, 1999, MMS granted the Lessees' requests for additional suspensions for the Leases for periods ranging from 19 to 45 months (the "November 1999 suspensions"). For all of the Leases, MMS granted the suspension requests pursuant to 30 C.F.R. § 250.110(a)(1)(1999), which authorizes MMS to grant lease suspensions "to facilitate proper development of a lease including reasonable time to construct production facilities."

37. In the November 12, 1999 suspension letters, MMS imposed certain "milestones" that the Lessees were required to meet. For example, for the Gato Canyon Unit, MMS required the Lessees to a detailed project description of the proposed exploration plans by February 2000, a revised plan of exploration by September 2001, and proof that they had sent out a request for proposal for a Mobile Offshore Drilling Unit ("MODU") by November 2001. MMS further required the Lessees to commence the drilling of an exploratory "delineation" well within the Gato Canyon Unit by May 1, 2003. In each of the November 12, 1999 letters, MMS informed the Lessees that "[m]eeting these milestones is a critical factor in our determination of whether the suspension continues, or whether potential future requests for suspension are granted."

38. On November 15, 1999, the State of California filed suit against the Secretary of Interior alleging, *inter alia*, MMS did not have the authority to grant the November 1999 suspensions without first determining, in accordance with the CZMA Section 307(c)(1) process, that those suspensions would be consistent with California's coastal management program. Those Lessees that serve as unit operators intervened as defendants. Both the Government and the lessee intervenors contested the State of California's argument before the district court. On June 20, 2001, the district court held that, as a result of the 1990 CZMA Amendments, the lease

suspensions were subject to the Section 307(c)(1) process. In doing so, the court made clear that its holding was based on those amendments:

> Because [under the 1990 Amendments] oil and gas leases must now be found to be consistent with the State's coastal management program at the time that they are sold, the Court finds that the granting of [the November 1999 suspensions] ... must likewise be subject to a consistency determination as a federal activity affecting the coastal zone, as defined by the CZMA. *California v. Norton*, 150 F. Supp.2d at 1053.

39. The court stated that its finding was "bolstered by the fact that the lessees must engage in certain milestone activities, including the spudding of delineation and exploratory wells, in order to continue the suspensions." *Id.*

40. Accordingly, the court ordered MMS to "provide the State of California with a determination that its grant of the lease suspensions at issue here is consistent with California's coastal management program." *Id.* at 1057. The Court directed MMS to set aside the November 1999 suspensions, and to direct suspensions of the Leases, *including all milestone activities*, "for a time sufficient for it to provide the State of California with a consistency determination [with respect to the November 1999 suspensions] in compliance with CZMA § 1456(c)(1) and its implementing regulations." *Id.* at 1057-58.

41. In compliance with the district court's order, MMS on July 2, 2001, set aside its approval of the November 1999 suspensions and directed a suspension of operations for the leases until MMS "has acted on" the Lessees' suspension requests.

42. Complying with the district court's order and MMS' instructions, the Lessees have not conducted any further operations on the Leases since June 20, 2001.

43. In letters dated July 16, 2001, MMS informed the unit operators that the agency would be reviewing the November 1999 suspension requests "over the next several

weeks" to determine whether their approval would have coastal effects. MMS stated that "[w]hen completed, we will submit our determination to the California Coastal Commission." Noting that under 15 C.F.R. § 930.41, absent an agreement with the state, the federal agency must not take final agency action less than 90 days after the state's receipt of that determination, MMS informed the operators that it might be able to act on the suspension requests as early as December 2001. The December 2001 date, coupled with the 90-day requirement, indicated that MMS was planning to issue either a "consistency" determination or a "negative" determination in September 2001.

44. Notwithstanding the explicit commitments set forth in the July 16, 2001, letters, the Lessees learned that MMS would not issue any Section 307(c)(1) determinations, but instead would let months or years pass while it awaited a decision by the Ninth Circuit on its appeal of the district court's decision in *California v. Norton*.

45. On August 31, 2001, the Lessees sent a letter to MMS protesting this course of action. The Lessees pointed out that the Government had not sought a stay of the district judge's order. They pointed out that the clear purpose of the directed suspensions contemplated by that order was to provide MMS with a limited period of time to make the Section 307(c)(1) determination, not to permit MMS to hold the leases in abeyance indefinitely while appealing the court's decision. The Lessees emphasized that, in light of the court's decision in *California v. Norton*, the 1990 Amendments to the CZMA, and their extension of the consistency review process to lease suspensions, had itself resulted in a significant delay to the Lessees' operations. This was so because all milestone activities were ordered suspended pending completion of the Section 307(c)(1) process. The Lessees objected to the considerable additional delay that would result from MMS' decision not to commence that process or issue a Section 307(c)(1)

determination pending the resolution of the Government's appeal. They noted that "if MMS were to determine to postpone issuance of the [Section 307](c)(1) determination until after the appeals process, the operators would likely be prevented from exploring and/or developing their leases for an additional two years or more. That delay would result regardless of the outcome of the appeal." The Lessees "urge[d] MMS to issue the [Section 307](c)(1) determination expeditiously."

46. On September 17, 2001, MMS responded that its attorneys were "working to determine the course of action which will best serve all constituents, including the lessees, the States and the public." The Lessees objected by letter on September 21, 2001, pointing out that the district court's "decision leaves MMS no choice but to promptly file a CZMA determination." MMS has not responded to this letter, nor has it conducted the Section 307(c)(1) determinations.

47. "Contract law expresses no view about the wisdom of [the government's action]"; the court "examine[s] only that [action's] consistency with the promises that the ...contract[] contained." *Mobil Oil*, 530 U.S. at 624. The Government commits a material breach of OCS leases if it fails to carry out its contractual obligations in a "timely and fair" manner or if, in processing the lessees' request for a necessary governmental approval, it "deviates significantly" from the "procedures and standards" in effect when the leases were issued in a manner that results in a "substantial" delay in or interference with the lessees' exploration and development of the leases. *Id.* at 620-21.

48. A post-leasing law that expressly states that the Government intends to deviate significantly from the existing "procedures and standards" so as to cause a material delay to the lessees' operations "amount[s] to a repudiation of the contracts." *Id.* at 612, 621; *see also*

*id.* at 608 ("a 'repudiation' is a statement by the obligor to the obligee indicating that the obligor *will commit a breach* ...") (citation and quotation omitted). In *Mobil Oil*, the OBPA constituted such an anticipatory repudiation because it "did not announce an (OBPA-required) approval delay of a few days or weeks, but of 13 months minimum, and likely much longer.... And lengthy delays matter, particularly where several successive agency approvals are at stake." *Id.*

49. The 1990 CZMA Amendments did not clearly communicate the Government's intent to deviate significantly from the existing procedures and standards so as to materially delay or interfere with the lessees' operations. The plain language of the 1990 CZMA Amendments did not subject lease suspensions to the CZMA Section 307(c)(1) process. When the 1990 Amendments were enacted, neither the Government nor the Lessees believed that the Amendments had such an effect, or that the Amendments would have any impact on the Lessees' right to obtain lease suspensions.

50. Even if the 1990 Amendments had clearly stated that future OCS lease suspension requests would be subject to the CZMA Section 307(c)(1) process and, as a result, operations under the OCS leases would be substantially delayed and potentially completely barred, the Amendments would have amounted, at most, to an anticipatory repudiation, pending actual application of the amendments to particular lessees. Moreover, to the extent that the application of the CZMA to the lease suspensions depended upon the milestones incorporated into the suspensions, no actual breach could have occurred until those milestones were established by MMS.

51. The June 2001 application of the 1990 CZMA amendments to require the Government to make a Section 307(c)(1) determination prior to granting the Lessees' November 1999 suspension requests, and the delay to the Lessees' operations under the Leases that has now

resulted, constituted a significant deviation from the "procedures and standards" in effect when the Leases were issued. As a result, the United States has failed to afford Lessees the "timely" and "fair" review of their lease suspension requests, and has caused significant, continuing and material delay to the Lessees' exploratory and development operations.

52. The Government caused additional significant, continuing and material delay to the Lessees' operations by refusing to issue a Section 307(c)(1) determination pending the resolution of its appeal of the *California v. Norton* decision.

**COUNT I**
**(Breach of Contract)**

53. The allegations contained in paragraphs 1 through 52 are incorporated herein by reference.

54. Lessees have complied in all material respects with their obligations under the Leases issued to them by the United States.

55. The United States as Lessor has committed an anticipatory repudiation, anticipatory breach, repudiation, and/or material breach of its lease obligations, and of its implied duty of good faith and implied duty not to hinder the Lessees' operations.

56. The United States' anticipatory repudiation, anticipatory breach, repudiation and/or material breach entitles Lessees, at their option, either to restitutionary damages equal to the bonuses and rentals paid to the United States, reliance damages equal to the bonuses and rentals paid to the United States and the amounts spent in exploring and preparing to develop the area covered by those Leases, or expectations damages equal to the profits that Lessees would have earned from the development of the Leases had the Government not committed an anticipatory repudiation, anticipatory breach, repudiation and/or material breach.

WHEREFORE, Devon prays that the Court —

(1) enter judgment against the United States in an amount equal to Devon's restitutionary, reliance or expectation damages, whichever is greater;

(2) grant such other and further relief as the Court deems just.

WHEREFORE, Anadarko prays that the Court —

(1) enter judgment against the United States in an amount equal to Anadarko's restitutionary, reliance or expectation damages, whichever is greater;

(2) grant such other and further relief as the Court deems just.

E. Edward Bruce
Steven J. Rosenbaum
(Attorney of Record)
Jeremy D. Kernodle
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Telephone: (202) 662-5568

Attorneys for Anadarko E&P Company LP and
Devon Energy Production Company, L.P.

Dated: December 27, 2004

# ATTACHMENT A

| Lease (unit) | Bonus Payment | Current Owner(s)* | Lease Interest | Share of Bonus |
|---|---|---|---|---|
| 396 (Lion Rock) | $163,251.600.00 | Aera<br>Anadarko | 96.50000 %<br>3.50000 | $157,537,794.00<br>5,713,806.00 |
| 397 (Lion Rock) | $42,101,660.00 | Aera<br>Nuevo<br>Anadarko | 48.25000 %<br>50.00000<br>1.75000 | $ 20,314,050.95<br>21,050,830.00<br>736,779.05 |
| 402 (Lion Rock) | $133,511,600.00 | Aera<br>Anadarko | 96.50000 %<br>3.50000 | $128,838,694.00<br>4,672,906.00 |
| 403 (Lion Rock)** | $32,510,600.00 | Aera (A)<br>(B)<br>Nuevo (A)<br>Anadarko (A)<br>(B) | 48.25000 %<br>96.50000<br>50.00000<br>1.750000<br>3.50000 | $ 23,529,546.75<br><br>8,127,650.00<br>853,403.25<br> |
| 408 (Lion Rock) | $51,565,000.00 | Aera<br>Anadarko | 96.50000 %<br>3.50000 | $ 49,760,225.00<br>1,804,775.00 |
| 414 (Lion Rock)** | $300,100.00 | Aera (A)<br>(B)<br>Anadarko (A) | 96.50000 %<br>100.00000<br>3.50000 | $ 294,848.25<br><br>5,251.75 |

---

* The current owners of the undeveloped Outer Continental Shelf leases offshore California at issue in this lawsuit are Amber Resources Company ("Amber"); Aera Energy LLC ("Aera"); Delta Petroleum Corporation ("Delta"); Devon Energy Production Company, L.P. ("Devon"); Nuevo Energy Company ("Nuevo"); Ogle Petroleum Inc. ("Ogle"); OLAC Resources, LLC ("OLAC"); Nycal Offshore Development Corporation ("Nycal"); RME Petroleum Company ("RME"); and Samedan Oil Corporation ("Samedan").

** Lease OCS-P 403 is divided into two halves for purposes of calculating ownership interests, each valued at $16,255,300.00. The current owner's percentage interest in the eastern half of the lease is indicated by the letter (A). The current owner's percentage interest in the western half of the lease is indicated by the letter (B).

** Lease OCS-P 414 is divided into two halves for purposes of calculating ownership interests, each valued at $150,050.00. The current owner's percentage interest in the eastern half of the lease is indicated by the letter (A). The current owner's percentage interest in the western half of the lease is indicated by the letter (B).

| | | | | |
|---|---|---|---|---|
| 427 (Purisima Point) | $13,956,500.00 | Aera | 52.94500 % | $ 7,389,268.93 |
| | | Devon | 30.00000 | 4,186,950.00 |
| | | Nuevo | 4.35415 | 607,686.94 |
| | | Ogle | 5.62542 | 785,111.74 |
| | | OLAC | 3.44700 | 481,080.56 |
| | | Samedan | 3.62843 | 506,401.83 |
| 432 (Purisima Point) | $12,679,300.00 | Aera | 53.64300 % | $ 6,801,556.90 |
| | | Devon | 30.00000 | 3,803,790.00 |
| | | Nuevo | 4.44640 | 563,772.40 |
| | | Ogle | 4.68526 | 594,058.17 |
| | | OLAC | 3.52004 | 446,316.43 |
| | | Samedan | 3.70530 | 469,806.10 |
| 460 (Gato Canyon) | $10,967,500.00 | Amber | 6.97108 % | $ 764,553.20 |
| | | Delta | 8.62930 | 946,418.48 |
| | | Nuevo | 15.29297 | 1,677,256.48 |
| | | Nycal | 4.25313 | 466,462.03 |
| | | Ogle | 3.00000 | 329,025.00 |
| | | OLAC | 9.50000 | 1,041,912.50 |
| | | Anadarko | 42.35352 | 4,645,122.31 |
| | | Samedan | 10.00000 | 1,096,750.00 |
| 462 (Gato Canyon) | $1,652,500.00 | Amber | 6.97108 % | $ 115,197.10 |
| | | Delta | 8.62930 | 142,599.18 |
| | | Nuevo | 15.29297 | 252,716.33 |
| | | Nycal | 4.25313 | 70,282.97 |
| | | Ogle | 3.00000 | 49,575.00 |
| | | OLAC | 9.50000 | 156,987.50 |
| | | Anadarko | 42.35352 | 699,891.92 |
| | | Samedan | 10.00000 | 165,250.00 |
| 464 (Gato Canyon) | $9,737,500.00 | Amber | 6.97108 % | $ 678,808.92 |
| | | Delta | 8.62930 | 840,278.09 |
| | | Nuevo | 15.29297 | 1,489,152.95 |
| | | Nycal | 4.25313 | 414,148.53 |
| | | Ogle | 3.00000 | 292,125.00 |
| | | OLAC | 9.50000 | 925,062.50 |
| | | Anadarko | 42.35352 | 4,124,174.01 |
| | | Samedan | 10.00000 | 973,750.00 |

# PLAINTIFFS' TOTAL INTERESTS IN BONUS PAYMENTS FOR UNDEVELOPED OCS LEASES

| Owner | Share of Bonus Payments |
|---|---|
| Anadarko | $ 23,256,109.29 |
| Devon | $ 7,990,740.00 |
| **Total** | $ 31,246,849.29 |

# ATTACHMENT B

Form 3300-1
(September 1978)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| Office | Serial number |
|---|---|
| Los Angeles, CA | OCS-P 0425 |
| Cash bonus: $104,040,000.00 | Rental rate: $8.00 per hectare |
| Minimum royalty rate: $8.00 per hectare | Royalty rate: 16 2/3% |
| Work commitment | Profit share rate |

This lease is effective as of JUL 1 1981 (hereinafter called the "Effective Date") by and between the United States of America (hereinafter called the "Lessor"), by the Manager, Pacific OCS Office, Bureau of Land Management, its authorized officer, and

| | |
|---|---|
| Amoco Production Company | 35.00000 % |
| Atlantic Richfield Company | 20.00000 % |
| Champlin Petroleum Company | 15.00000 % |
| Elf Aquitaine, Inc. | 20.00000 % |
| Aminoil USA, Inc. | 10.00000 % |

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered 1,2,4,5,6,7 and 8 attached hereto, the Lessee and Lessor agree as follows:

Sec. 1. Statutes and Regulations. This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462 as amended; 43 U.S.C. 1331 et. seq. (hereinafter called the "Act"). The lease is issued subject to the Act; Sections 302 and 303 of the Department of Energy Organization Act, 91 Stat. 578, 42 U.S.C. 7152 and 7153; all regulations issued pursuant to such statutes and in existence upon the effective date of this lease; all regulations issued pursuant to such statutes in the future which provide for the prevention of waste and the conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein; and all other applicable statutes and regulations.

Sec. 2. Rights of Lessee. The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf described as follows:

All Block 154, OCS Official Protraction Diagram, NI 10-6, Santa Maria

(Tract 53-201)

acres or hectares (hereinafter referred to as the "leased area").

Thes 's include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the United States Geological Survey or the Director's dele te (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

Sec. 3. Term. This lease shall continue for an initial period of five years from the Effective Date of the lease and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon.

Sec. 4. Rentals. The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental of per acre ( $8.00 per hectare) or fraction thereof.

Sec. 5. Minimum Royalty. The Lessee shall pay the Lessor at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty of per acre ( $8.00 per hectare) or fraction thereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

Sec. 6. Royalty on Production. (a) The Lessee shall pay a fixed royalty of 16-2/3 percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium) is subject to royalty. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated, will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty paid in amount in excess of tankage required when royalty is paid in value. When royalties are paid in amount, the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

Sec. 7. Payments. The Lessee shall make all payments to the Lessor by check, bank draft, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the United States Geological Survey and tendered to the Director, except that filing charges, bonuses, first year's rental, and other payments due upon lease issuance, shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

Sec. 8. Bonds. The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operati  have begun, the Lessor deems such additional securi  be necessary.

Sec. 9. Plans. The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans, and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

Sec. 10. Performance. The Lessee shall comply with all regulations and orders relating to exploration, development, and production. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

Sec. 11. Directional Drilling. A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Sec. 12. Safety Requirements. The Lessee shall (a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the leased area;

(b) maintain all operations within the leased area in compliance with regulations intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

Sec. 13. Suspension and Cancellation. (a) The Lessor may suspend or cancel this lease during the initial lease term or thereafter pursuant to Section 5 of the Act and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in Section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

Sec. 14. Indemnification. The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

Sec. 15. Disposition of Production. (a) As provided in Section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16-2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price, or if no regulated price applies, at the fair market value at the well head of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) As provided in Section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal agency pursuant to Section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price, or if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in Section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war, or when the President of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas p  luced from the leased area, as provided in Section 12(b)  Act.

Sec. 16. Unitization, Pooling, and Drilling Agreements. Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

Sec. 17. Equal Opportunity Clause. During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60—1.4(a)), and the implementing regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

Sec. 18. Certification of Nonsegregated Facilities. By entering into this lease, the Lessee certifies, as specified in 41 CFR 60—1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60—1.5.

Sec. 19. Reservations to Lessor. All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights include:

(a) the right to authorize geological and geophysical exploration in the leased area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in Section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being with an area needed for national defense, and so long as such designation remains in effect no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within, any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 20. Transfer of Lease. The Lessee shall file for approval with the appropriate field office of the Bureau of Land Management any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

Sec. 21. Surrender of Lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Bureau of Land Management a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

Sec. 22. Removal of Property on Termination of Lease. Within a period of one year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

Sec. 23. Remedies in Case of Default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of Section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of Section 24 of the Act. Furthermore, pursuant to Section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

Sec. 24. Unlawful Interest. No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified, and during this continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 7, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431—433, relating to contracts made or entered into, or accepted by or on behalf of the United States, from a part of this lease insofar as they may be applicable.

| | |
|---|---|
| Champlin Petroleum Company | THE UNITED STATES OF AMERICA, Lessor |
| (Lessee) | |
| D.O. Churchill | William E. Grant |
| (Signature of Authorized Officer) | (Signature of Authorized Officer) |
| D.O. Churchill | WILLIAM E. GRANT |
| (Name of Signatory) | (Name of Signatory) |
| Vice President | Manager, Pacific OCS Office<br>Bureau of Land Management |
| (Title) | (Title) |
| June 10 ,1981 | JUN 19 1981 |
| (Date) | (Date) |

100 Oceangate Suite 620
Long Beach, California 90802

(Address of Lessee)

AMINOIL USA, INC., lessee

Signature of Authorized Officer

Jerry F. Brasher
Name of Signatory

CONTRACT AGENT
Title

JUN 1 1 1981
Date

P.O. Box 94193
Houston, Texas 77018

AMOCO PRODUCTION COMPANY, lessee

Signature of Authorized Officer

DAVID F. WORK
Name of Signatory

Its Attorney in Fact
Title

Date

Amoco Building
Denver, Colorado 80202

ATLANTIC RICHFIELD COMPANY, lessee

Signature of Authorized Officer

J. L. WILSON
Name of Signatory

Vice President
Title

June 10, 1981
Date

717 Seventeenth Street
P.O. Box 5543
Denver, Colorado 80217

ATTEST:

M.K. Singletary
Assistant Secretary

ELF AQUITAINE, INC., lessee

Signature of Authorized Officer

Jean-Paul Giraudet
Name of Signatory

Vice President
Title

JUN 1 1 1981
Date

One Memorial City Plaza
800 Gessner Suite 1200
Houston, Texas 77024

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale No. 53
Outer Continental Shelf
Central and Northern California

STIPULATION NO. 1

(a) If the DCMOFO has reason to believe that biological populations or habitats exist and require protection, he shall give the lessee notice that the lessor is invoking the provisions of this stipulation and the lessee shall comply with the following requirements. Prior to any drilling activity or the construction or placement of any structure for exploration or development on lease areas including, but not limited to, well drilling and pipeline and platform placement hereinafter referred to as "operation," the lessee shall conduct site-specific surveys as approved by the DCMOFO and in accordance with prescribed biological survey requirements to determine the existence of any special biological resource including, but not limited to:

(1) Very unusual, rare, or uncommon ecosystems or ecotones.

(2) A species of limited regional distribution that may be adversely affected by any lease operations.

If the results of such surveys suggest the existence of a special biological resource that may be adversely affected by any lease operation, the lessee shall: (1) relocate the site of such operation so as not to adversely affect the resources identified; or (2) establish to the satisfaction of the DCMOFO, on the basis of the site-specific survey, either that such operation will not have a significant adverse effect upon the resource identified or that a special biological resource does not exist. The DCMOFO will review all data submitted and determine, in writing, whether a special biological resource exists and whether it may be significantly affected by the lessee's operations. The lessee may take no action until the DCMOFO has given the lessee written directions on how to proceed.

(b) The lessee agrees that if any area of biological significance should be discovered during the conduct of any operations on the leased area, he shall report immediately such findings to the DCMOFO, and make every reasonable effort to preserve and protect the biological resource from damage until the DCMOFO has given the lessee directions with respect to its protection.

STIPULATION NO. 2

If the DCMOFO, having reason to believe that a site, structure or object of historical or archaeological significance, hereinafter referred to as a "cultural resource," may exist in the lease area, gives the lessee written notice that the lessor is invoking the provisions of this stipulation, the lessee shall upon receipt of such notice comply with the following requirements.

Prior to any drilling activity or the construction or placement of any structure for exploration or development on the lease, including but not limited to, well drilling and pipeline and platform placement, hereinafter in this stipulation referred to as "operation," the lessee shall conduct remote sensing surveys to determine the potential existence of any cultural resource that may be affected by such operations. All data produced by such remote sensing surveys as well as other pertinent natural and cultural environmental data shall be examined by a qualified marine survey archaeologist to determine if indications are present suggesting the existence of a cultural resource that may be adversely affected by any lease operation. A report of this survey and assessment prepared by the marine survey archaeologist shall be submitted by the lessee to the DCMOFO and the Manager for review.

If such cultural resource indicators are present the lessee shall: (1) locate the site of such operation so as not to adversely affect the identified location; or (2) establish, to the satisfaction of the DCMOFO, on the basis of further archaeological investigation conducted by a qualified marine survey archaeologist or underwater archaeologist using such survey equipment and techniques as deemed necessary by the DCMOFO, either that such operation shall not adversely affect the location identified or that the potential cultural resource suggested by the occurrence of the indicators does not exist.

A report of this investigation prepared by the marine survey archaeologist or underwater archaeologist shall be submitted to the DCMOFO and the Manager for their review. Should the DCMOFO determine that the existence of a cultural resource which may be adversely affected by such operation is sufficiently established to warrant protection, the lessee shall take no action that may result in an adverse effect on such cultural resource until the DCMOFO has given directions as to its preservation.

The lessee agrees that if any site, structure, or object of historical or archaeological significance should be discovered during the conduct of any operations on the leased area, he shall report immediately such findings to the DCMOFO and make every reasonable effort to preserve and protect the cultural resource from damage until the DCMOFO has given directions as to its preservation.

STIPULATION NO. 4

(a) The lessee agrees that prior to operating or causing to be operated on its behalf boat or aircraft traffic into individual, designated warning areas, the lessee shall coordinate and comply with instructions from the Commander, Western Space and Missile Center (WSMC), the Commander, Pacific Missile Test Center (PMTC), and the Commander, Fleet Area Control and Surveillance Facility (FACSFAC), or other appropriate military agency. Such coordination and instruction will provide for positive control of boats and aircraft operating in the warning areas at all times.

(b) The lessee, recognizing that mineral exploration and exploitation and recovery operations of the leased areas of submerged lands can impede tactical military operations, hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations of the lessee under this lease in the interests of national security requirements. Such temporary suspension of operations, including the evacuation of personnel, and appropriate sheltering of personnel not evacuated (an appropriate shelter shall mean the protection of all lessee personnel for the entire duration of any Department of Defense activity from flying or falling objects or substances), will come into effect upon the order of the DCMOFO, after consultation with the Commander, Western Space and Missile Center (WSMC), the Commander, Pacific Missile Test Center (PMTC), and the Commander, Fleet Area Control and Surveillance Facility (FACSFAC), or other appropriate military agency, or higher authority, when national security interests necessitate such action. It is understood that any temporary suspension of operations for national security may not exceed seventy-two hours; however, any such suspension may be extended by order of the DCMOFO. During such periods equipment may remain in place.

(c) The lessee agrees to control his own electromagnetic emissions and those of his agents, employees, invitees, independent contractors or subcontractors emanating from individual, designated defense warning areas in accordance with requirements specified by the Commander, Western Space and Missile Center (WSMC), the Commander, Pacific Missile Test Center (PMTC), or other appropriate military agency, to the degree necessary to prevent damage to, or unacceptable interference with Department of Defense flight, testing or operations activities conducted within individual, designated warning areas. Necessary monitoring, control, and coordination with the lessee, his agents, employees, invitees, independent contractors or subcontractors, will be effected by the Commander of the appropriate onshore military installation conducting operations in the particular warning area: provided, however, that control of such electromagnetic emissions shall permit at least one continuous channel of communication between a lessee, its agents, employees, invitees, independent contractors or subcontractors and onshore facilities.

STIPULATION NO. 5

Whether or not compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise, the lessee assumes all risks of damage or injury to persons or property, which occurs in, on, or above the Outer Continental Shelf, to any

person or persons or to any property of any person or persons who are agents, employees or invitees of the lessee, its agents, independent contractors or subcontractors doing business with the lessee in connection with any activities being performed by the lessee in, on, or above the Outer Continental Shelf, if such injury or damage to such person or property occurs by reason of the activities of any agency of the U.S. Government, its contractors, or subcontractors, or any of their officers, agents or employees, being conducted as a part of, or in connection with, the programs and activities of the Western Space and Missile Center (WSMC), the Pacific Missile Test Center (PMTC), or other appropriate military agency.

Notwithstanding any limitations of the lessee's liability in section 14 of the lease, the lessee assumes the risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or subcontractors, or any of their officers, agents, or employees. The lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the lessee, and to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the agents, employees, or invitees of the lessee, its agents or any independent contractors or subcontractors doing business with the lessee in connection with the programs and activities of the aforementioned military installations and agencies, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of their officers, agents, or employees and whether such claims might be sustained under theories of strict or absolute liability or otherwise.

## STIPULATION NO. 6

(a) Pipelines will be required: (1) if pipeline rights-of-way can be determined and obtained; (2) if laying of such pipelines is technologically feasible and environmentally preferable; and (3) if, in the opinion of the lessor, pipelines can be laid without net social loss, taking into account any incremental costs of pipelines over alternative methods of transportation and any incremental benefits in the form of increased environmental protection or reduced multiple use conflicts. The lessor specifically reserves the right to require that any pipeline used for transporting production to shore be placed in certain designated management areas. In selecting the means of transportation, consideration will be given to any recommendation of the intergovernmental planning program for assessment and management of transportation of Outer Continental Shelf oil and gas with the participation of Federal, State, and local governments and the industry.

(b) Following the completion of pipeline installation, no crude oil production will be transported by surface vessel from offshore production sites, except in the case of emergency. Determinations as to emergency conditions and appropriate responses to these conditions will be made by the DCMOFO.

(c) Where the three criteria set forth in the first sentence of this stipulation are not met and surface transportation must be employed, all vessels used for carrying hydrocarbons to shore from the leased area will conform with all standards established for such vessels, pursuant to the Port and Tanker Safety Act of 1978 (PL 95-474).

## STIPULATION NO. 7

(a) Wells. Subsea wellheads and temporary abandonments, or suspended operations that leave protrusions above the seafloor, shall be protected, if feasible, in such a manner as to allow commercial trawling gear to pass over the structure without snagging or otherwise damaging the structure or the fishing gear. Latitude and longitude coordinates of these structures, along with water depths, shall be submitted to the DCMOFO. The coordinates of such structures will be determined by the lessee utilizing state-of-the-art navigation systems with accuracy of at least ±50 feet (15.25 meters) at 200 miles (322 kilometers).

(b) Pipelines. All pipelines, unless buried, including gathering lines, shall have a smooth surface design. In the event that an irregular pipe surface is unavoidable due to the need for valves, anodes or other structures, those irregular surfaces shall be protected in such a manner as to allow trawling gear to pass over the object without snagging or otherwise damaging the structure or the fishing gear.

**STIPULATION NO. 8**

The lessee shall include in his exploration and development plans, submitted under 30 CFR 250.34, a proposed fisheries training program for review and approval by the DCMOFO. The training program shall be for the personnel involved in vessel operations (related to offshore exploration and development and production operations), and platform and shore-based supervisors. The purpose of the training program shall be to familiarize persons working on the project of the value of the commercial fishing industry, the methods of offshore fishing operations, the potential conflicts between fishing operations and offshore oil and gas activities, the locations of marine mammal and bird rookery sites in the area, the seasonal abundance and sensitivities of these animals to disturbance, and the Federal laws that have been established to protect endangered and threatened species from harassment and injury. The program shall be formulated and implemented by qualified instructors.